**People of the State of Illinois, Plaintiff-Appellee, v. Aster Turner, Jr., Defendant-Appellant.**

**Gen. No. 51,276.**

First District, First Division.

April 10, 1967.

Eugene T. Noonan, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE BURMAN delivered the opinion of the court.

Defendant-appellant, Aster Turner, Jr., was indicted for murder and his codefendants, Curtis Sanders and William Jenkins, were charged with being accessories after

the fact and with murder. After a joint jury trial in July 1961, defendants Jenkins and Sanders were found not guilty on the murder charge and on being found guilty of being accessories after the fact were each sentenced by the court to one year to one year and a day in the penitentiary and fined $1 which fine was suspended. The jury found the defendant Aster Turner, Jr. guilty of murder and fixed his punishment as imprisonment in the penitentiary for a 199-year term and he alone brings this appeal.

The defendant contends: (1) that the evidence is insufficient to prove his guilt beyond a reasonable doubt because: (a) the deceased threatened to use force against the defendant; (b) the defendant was not the aggressor; (c) the danger to the defendant was imminent; (d) the force threatened by the deceased was unlawful; (e) the defendant reasonably believed that danger existed, that the use of force was necessary to avert the danger and that the kind and amount of force he used was necessary. It is further contended: (2) that the trial court committed numerous errors during the trial: (a) in refusing to allow Mrs. Mollie Turner to testify to Driver's reputation for violence, and in refusing to allow her to testify about threats which she received prior to the shooting; (b) in excluding evidence that Driver was a member of a gang known as the Vice Lords; (c) in allowing the statement of codefendant William Jenkins to be considered as evidence of the defendant's guilt; (d) in instructing the jury that they might consider the element of flight in determining the defendant's guilt; (e) in ignoring the defendant's plea of self-defense in its instructions on the definition of murder and that the prosecutor's closing argument was inflammatory and not based on the evidence to the prejudice of defendant.

The testimony presented by the State showed that on the evening of June 10, 1961, Malcolm Driver, Vivian Collins and James Ruffin were standing in front of a

tavern at 3510 Ogden Avenue when an automobile containing four men pulled to the curb in front of them. The defendant, Aster Turner, Jr., and Curtis Sanders got out of the car and the defendant asked Driver if he would buy him a drink. Driver testified he refused and asked Turner, "did he want me to buy him a drink for the way he had treated me the Saturday night before then. And when I said this he said he would blow my brains out on the street. And I said if you do, you have to shoot me in the back." He said he then started walking away and when the defendant told him to stop he heard Vivian shouting that he should be careful because the defendant had a gun in his hand, "And when I turned around, he was standing with the gun on me." He testified that he then met Charles Garrett, the deceased, who asked him what was happening and after being told Garrett walked up to the defendant and told him, "You don't bring no four men on this corner to double team one man about something that is over with." He said the defendant cursed Garrett, ran back to the car and as the car started pulling away he started shooting. He heard three shots and saw Garrett, who was fifteen feet from the car, fall down.

James Ruffin testified that after the car pulled up he saw the defendant get out and walk up to Driver, pull out a gun and after putting it back in his belt, got into the car. He said Garrett came out of the tavern, walked up to the car and someone in the car cussed him. He heard three shots and Garrett was killed. On cross-examination he said that prior to the shooting he heard the defendant say, "I'll kill you" and Driver replied, "If you are going to shoot me, you are going to have to shoot me in the back and he turned around and walked away." He said there was no argument between them, just loud talking. He also said that Garrett was about four or five feet from the car when the shots were fired and he testified on redirect that the car was pulling away when he heard the shots and saw Garrett fall to the ground.

15

Fourteen-year-old Vivian Collins testified that the defendant and Driver were arguing and the defendant "showed" a gun. She said Garrett went over to see what was wrong, and as the car was moving he pointed to the defendant and said something and "before I knows it, I just saw two shots go off" and Garrett was shot. On cross-examination she said both Driver and the defendant were cussing each other. She also said that Garrett was close to the car when the defendant shot him, that there were no words between them when it happened and that the defendant did not threaten Garrett.

Dr. Eulogio Tappia, a coroner's pathologist, testified that two bullets went through Garrett's body, one penetrating his lung hitting the spinal cord and the other hitting the groin. He said there was alcohol present in Garrett's body, but it did not amount to intoxication.

Aster Turner, Jr. testified in his own defense that he received several phone calls shortly before the shooting threatening to kill him, his wife and baby, including one call from Driver whom he knew for about one year. On the day in question he and William Jenkins were in an automobile driven by Curtis Sanders and were on their way to purchase liquor when he saw "C. L." (Driver's cousin) a friend of his, and he told Sanders to stop. He said he asked "C. L." if he had any money and when he said no he asked him if he wanted a drink and "C. L." said no. He said "C. L." left, and Driver came over and threatened to kill him. When Sanders came out of the tavern they returned to the car. He said when they got in the car Driver had a knife in his hand and Garrett, whom he didn't know, pulled a gun and fired in the car. "And when he shot, I went in the coat and got the pistol out." He testified that he did not have the pistol outside the car, but that he had left it inside his coat in the car.

On cross-examination he said that after Garrett shot and hit the inside roof of the car, he took his gun from his coat and fired two shots. He also said that he had

16

the loaded gun with him because "they had threatened his life." At the time of the shooting he said Driver was attempting to open the car door and had a knife in his hand. He admitted that he never told the police he shot in self-defense.

Curtis Sanders testified that he had not known Garrett or Ruffin before the occurrence but had seen Driver before. He said when they arrived at the tavern the defendant told him to stop because he saw a friend of his. They got out of the car and while the defendant was talking to "C. L." he went into the tavern to purchase whiskey and when he came out he saw four men arguing with the defendant and cursing him. After he heard Driver threaten the defendant he said he pushed Turner to the car, warning him that the men were gang fighters. He testified that he saw four men "rushing the side of the car" when a "gunshot goes off right over the right hand side of the convertible top of the car." He also said that Garrett pulled the car door open as he was pulling out and that the defendant didn't have a gun when he was outside the car. On cross-examination he testified that after a shot was fired over the defendant's head he saw the defendant fire his gun, but he didn't know if Turner shot the man.

C. L. Driver testified for the defense that he met the defendant as he came out of the tavern at the site and was asked if he had any money and when he said no the defendant asked him if he wanted a drink, and he again declined. He further testified that, "He (defendant) said he had been arguing with some guys. He said he didn't know who the guy was. I said, well, is that them coming there. He says he didn't know. I says, well I have got to go, and I left."

Mollie Turner, the defendant's wife, testified that in the month preceding the occurrence there were several phone calls by men who would not give their names. She said she knew Driver for two years, that he came to her

home with her husband many times, that he wore an earring and that his reputation in the community was bad. On cross-examination she said her babysitter told her of Driver's reputation, but that her husband was not aware of this reputation.

Opal Jenkins, wife of the codefendant William Jenkins, testified that she knew Driver for about six months and that his reputation in the community for being a peaceful citizen was bad.

The defendant first contends that the evidence is insufficient to prove him guilty beyond a reasonable doubt as Garrett had threatened him, followed him to the car, and then fired a gun at him, and he points out that the police found a bullet hole in the car top. He further argues that even though one may be the initial aggressor, if he abandons the aggression he may use force to defend himself if threatened with death or great bodily harm, citing People v. Forte, 269 Ill 505, 110 NE 47 and People v. Allen, 378 Ill 164, 37 NE2d 854. The defendant maintains that he reasonably believed that danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force he used was necessary. People v. Motuzas, 352 Ill 340, 185 NE 614.

The State's evidence, offered through Malcolm Driver, James Ruffin and Vivian Collins, showed that the defendant pointed a gun at Driver and threatened to kill him before returning to the car. They also testified that neither Driver nor Garrett attacked the defendant or had a weapon of any type at any time. It is admitted that the defendant brought a loaded automatic with him to the scene of the occurrence and it is uncontradicted that when he fired two bullets that killed Garrett the car was moving, leaving or pulling out. Whether the killing of Garrett was justified under the law of self-defense was, in our opinion, placed squarely before the jury, and is always a question of fact to be determined by the jury under proper instructions. People v. Johnson, 2 Ill2d 165, 117

18

NE2d 91. Once the jury has decided that fact question a reviewing court will not disturb that finding unless the evidence is palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. People v. Jordan, 18 Ill2d 489, 165 NE2d 269; People v. McClain, 410 Ill 280, 102 NE2d 134. We are satisfied that there was ample evidence to support the verdict of the jury.

█ The defendant maintains that the court erred in refusing to allow defendant to introduce evidence of self-defense by (a) refusing to allow the defendant's wife to testify to Driver's reputation for violence and threats she had received immediately prior to the shooting and (b) in excluding evidence that Malcolm Driver was a member of a gang known as the Vice Lords. During the examination of the defendant's wife she was asked if she knew Driver's "reputation in the community for fighting and belligerence" and the court sustained the State's objection to the question. In support of his argument the defendant cites People v. Brindley, 369 Ill 486, 17 NE2d 218, where the court held that it was error to totally exclude evidence offered to prove the reputation of the deceased in the community was that of a dangerous, quarrelsome and vicious man where there were no eyewitnesses to the killing and some testimony that the deceased was the assailant. The circumstances in the instant case differ from Brindley. Here the court agreed with defense counsel that he could ask about Driver's reputation in the community, but suggested he should lay a foundation first which counsel then did. Later, with the court's assistance, counsel asked the witness whether she knew Driver's general reputation for being a peaceful and law-abiding citizen and was it good or bad and she answered that it was bad. Mrs. Opal Jenkins also testified that Driver's reputation in the community for being a peaceful citizen was bad. Under the circumstances we

can only conclude that the trial court committed no error in its original ruling on admissibility.

 It is also contended that the court erred in sustaining objections to conversations regarding threatening phone calls Mrs. Turner said she received. One of these calls she admitted was received by her sister and testimony as to this call would be clearly hearsay. She said the other two phone calls were made by men, but she didn't know their names or who they were. We are of the opinion that the objection to the phone conversations was properly sustained as the witness was unable to lay a proper foundation for these calls. The Illinois rule is that telephone conversations, the substance of which is relevant and material to the issues, are competent provided the identity of the person with whom the conversation was had is established by direct evidence or facts and circumstances. People v. Nichols, 378 Ill 487, 38 NE2d 766.

Furthermore, the defendant did testify that he had been getting phone calls and that one of them was from Driver who he said threatened to kill him. He also testified that he received another call from an unknown person who threatened him about the same matter as Driver had and who also threatened to kill him. We are satisfied that the jury was amply informed by the Turners that they were receiving threatening phone calls shortly before the shooting.

 The defendant further contends that the court erred in excluding evidence that Driver was a member of a gang known as the Vice Lords. The record shows that Mrs. Turner said Driver wore an earring and when she was asked what it signified an objection was made and sustained. She was also asked whether Driver was a member of the Vice Lords or any gang and an objection that it was leading and suggestive was made and sustained. Mrs. Jenkins was also asked whether Driver was

20

a member of the Vice Lords and her affirmative answer was stricken. The defendant made an offer of proof intended to show that Driver was a member of the Vice Lords, a gang sworn to violence, which was also denied. The defendant argues, and we agree, that where the claim of self-defense is asserted in a prosecution for murder, every circumstance which tends to explain the defendant's motive should be submitted to the jury. Williams v. The People, 54 Ill 422; Davids v. The People, 192 Ill 176, 61 NE 537. However, we are of the opinion that the evidence the defendant wished to place before the jury—that the Vice Lords were a gang sworn to violence, that Driver was a member and by inference that the deceased was also a member—was repeatedly presented to the jury by subsequent testimony.

Codefendant Sanders testified on direct that when he pushed the defendant away from Driver he told the defendant, "Man, don't you know this is those gang fighters you are messing with, you better get in the car, we ain't got nothing to protect ourselves, because those guys break people's legs and go on the street." On cross-examination he said he didn't know the deceased and when asked if he knew Driver he answered, "Yes, they said he was a Vice Lord because he had an earring in his left ear." He stated that the members of the Vice Lords wear an earring.

The defendant, on direct, related that in a phone conversation prior to the occurrence he told Driver, "I said what do you mean you are going to kill me, who all are going to kill me. He said, 'Us Vice Lords.' " He also said that he received a call from an unknown person who identified himself as a Vice Lord and threatened him. The following day he said he was almost run over by a car and that a person in the car said, "We are Vice Lords, don't get in our way" and that, "I knew it was the Vice Lords, because they had the earrings in the left ear." He

also testified that when Sanders came out of the tavern during his argument with Driver, Sanders said, "Look, man, you go ahead leave the Vice Lords, you don't know these teenagers they kill people and knock people's eyes out." He said the deceased told him, "Don't nobody f—— with the Vice Lords," just before he shot at the defendant.

██ ██ It is clear from the record that the defendant by persistence amply informed the jury that Driver and the deceased were members of the Vice Lords, a gang sworn to violence. After considering this later testimony we are of the opinion that the trial court's earlier exclusion of testimony was not prejudicial to the defendant. When the same substantial evidence is produced by subsequent testimony, its earlier exclusion is not a ground for reversal on appeal. People v. Jones, 26 Ill2d 300, 186 NE2d 314.

It is next contended that it was error to allow the oral statement of William Jenkins made to the police after his arrest, to be considered as evidence of Turner's guilt. Detective John Loftus related various oral statements made by Jenkins at the time of his arrest. When he said Jenkins told them that the deceased was 15 or 20 feet from the car when he was shot, defense counsel for the first time objected and moved that any statements made outside the presence of the other two defendants be stricken. The court stated that it was admissible against Jenkins and did not at that time instruct the jury to disregard the statement as to the other two defendants, as requested by defense counsel. Counsel then proceeded to cross-examine the witness about the oral statements made by Jenkins. Immediately after this testimony and upon suggestion of the court the written statements of Curtis Sanders and William Jenkins were offered and received into evidence over objection. Before the statements were read to the jury the court instructed the jury as follows:

The jury will understand, however, that these statements are admitted only and solely against the person making them. He has a right to tell the officer his part in the transaction. If the State wants to use him as a witness against the other two defendants, they should put him on the stand. But the statement as to each defendant, showing his presence or part in the controversy, in which he admits to the officers his part, is admissible against him. And with that reservation objection overruled.

██ ██ Defendant's principal argument appears to be that prior to Detective Loftus' testimony the State's witnesses were in conflict about the distance between the deceased and the car at the time of the shooting. Because of this conflict it is urged that the trial judge erred in refusing to instruct the jury that Loftus' statement that Sanders said the deceased was 15 or 20 feet from the car was to be disregarded by the jury as evidence of Turner's guilt. People v. Tyner, 30 Ill2d 101, 195 NE2d 675. It is true that the trial judge did not immediately admonish the jury upon objection, but the court did promptly so instruct the jury immediately after the close of this testimony. It is established by Tyner and People v. White, 28 Ill2d 23, 190 NE2d 817, that when two defendants are tried jointly the statement of one defendant is admitted into evidence, even though as to the other defendant it is a hearsay accusation, if its admissibility is limited to the defendant who made the statement. In the case at bar no objection was made to the officer's relating the oral statements of Sanders until he testified as to the complained of distance and the comments of the court at that time showed that he was concerned whether some of Sanders' other oral statements were not objectionable. The court then suggested that the matter of the written statements of the codefendants be discussed which was done. It is obvious that the court intended to instruct the jury about

23

the objected to oral statement and the written statements at one time, which he did, while it was fresh in the minds of the jury. We discern no error in this procedure.

It is next contended that the court erred in instructing the jury that they might consider the element of flight in determining the defendant's guilt. It is hornbook law, the defendant states, that it is error to give instructions not applicable to the evidence in the case. People v. Lawson, 351 Ill 457, 184 NE 606. It is uncontradicted, as argued, that the defendant in the case at bar surrendered himself and that his counsel gave the police the automatic which was admitted into evidence. In People v. Davis, 29 Ill2d 127, 193 NE2d 841, cited by defendant, the Court held that it was prejudicial error not to permit the defendant who had surrendered himself to testify as to what motivated his flight. In People v. Martin, 380 Ill 328, 44 NE2d 49, the defendant was charged with taking indecent liberties with a child. The Court there found the testimony of the child of doubtful value because while she said the defendant was not the man, on confronting him one week after the incident, she had changed her mind at the time of the trial after a talk with her mother and the prosecution. The State had contended that the flight of the defendant was proof of his guilty conscience and tended to corroborate the testimony of the child. It was there held that the fact that the defendant was highly nervous and mentally unstable, and was easily persuaded to return and surrender when no charges had been made against him up to that time, overcame the presumption which the State contended arose because of his alleged flight. Neither of these cases held, per se, that the giving of a flight instruction in itself was improper.

In the instant case there were eyewitnesses to the shooting. The defendant's testimony, and that of his co-defendant, placed the deceased at the car when the car was moving and the defendant fired the fatal shots. This occurred on June 10th and on June 24th, Curtis Sanders,

the codefendant, was apprehended and arrested after a search. He told the officers that the car belonged to William Jenkins and in his signed statement he said that when the deceased came to the car, after the defendant had an argument with another fellow, the defendant took a gun from his belt and fired one or two shots and the deceased clutched at his stomach. They left the scene of the shooting and when they stopped the car, some distance away, Jenkins asked the defendant where he got his gun and the defendant replied that his father gave it to him.

The defendant admitted that he knew he shot his automatic at close range to the deceased and twenty days later surrendered himself on the advice of his attorney. During that period of time the police were looking for the persons responsible for the shooting. Whether the defendant was in hiding was a question of fact and the jury was instructed that the fact of flight was a circumstance to be considered with all the other evidence in the case as tending to prove guilt. We are satisfied that this instruction was based on the evidence in the case and was proper.

The defendant also objects to certain remarks made by the prosecutor, in closing argument, to the effect that, "You know there is an old saying when counsel doesn't have a defense then they have to invent one." The prosecutor then said, "And here we have heard the invention of the Vice Lords. That is all they have talked about. Yet there is no evidence under oath that these boys belonged to any club." No objection was made to these remarks at the trial. As was stated in People v. Woodley, 57 Ill App2d 380, 206 NE2d 743, every remark reflecting on opposing counsel will not serve as grounds for reversal, though there can be no doubt that such remarks should not be indulged in. Nor will every improper or ill advised statement, in the closing argument to the jury, warrant reversal of defendant's conviction. Having examined the entire record we are of the opinion that the remarks complained of did not influence the jury so as to

result in substantial prejudice to the accused. People v. Simmons, 26 Ill2d 400, 186 NE2d 263; People v. Burnett, 27 Ill2d 510, 190 NE2d 338.

It is further contended that the trial court erred in ignoring the defendant's plea of self-defense in its four instructions to the jury on the definition of murder citing People v. Ruffin, 406 Ill 437, 94 NE2d 433. In Ruffin it was held that the instructions did not fully and fairly announce the law applicable to defendant's plea of self-defense. In the instant case, however, three detailed instructions on the subject of self-defense were given as follows:

> The Court instructs the jury that if a person is assaulted in such a way as to induce in him a reasonable and well-grounded belief that he is actually in danger of losing his life or of suffering great bodily harm, then he would be justified in defending himself whether the danger is real or only apparent. Actual and positive danger is not necessary to justify self-defense. All that is necessary is that the defendant had reasonable grounds to believe that the danger was real and about to befall him, and if he acted in good faith and under an honest belief that he was in apparent danger of losing his life or receiving great bodily harm, then he cannot be found guilty even though he may have made a mistake as to the impending danger.

> There is no law requiring a defendant, when threatened with danger to retreat or flee to safety. The law does not require a man to avoid the presence of other persons who affect the freedom of the street and proper places. A man, if unlawfully assaulted in a place where he has a right to be, and put in danger, real or reasonably apparent, of losing his life or receiving great bodily harm, is not required to endeavor to escape from his assailant, but may stand his ground and repel force with force, even to the taking

26

of the life of his assailant, if necessary, or in good reason apparently necessary for the preservation of his own life or to protect himself from receiving great bodily harm.

The Court instructs the jury, as a matter of law, that before a defendant can avail himself of the right of self-defense, as the same is defined in these instructions, it must appear to him, acting as a reasonable person, that at the time of the killing the danger was apparently so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily harm, the killing was absolutely necessary.

▮ The record also reveals that the court further instructed the jury that each instruction should be considered with all other instructions bearing upon the same subject. Defendant also concedes, in his reply brief, that each and every instruction need not make reference to self-defense. It is sufficient if the series of instructions, construed as a whole, fully and fairly announced the law applicable to the theories of the defendant. People v. Sims, 393 Ill 238, 66 NE2d 86.

▮ ▮ However, it is also contended that one of the self-defense instructions was erroneous because it stated that in order to establish self-defense, the defendant's belief that he was in danger must be "well grounded." It is argued that this requirement was erroneous since it imposed a stricter degree of proof than the law requires citing People v. Beil, 322 Ill 434, 153 NE 639. In Beil the Court stated that the additional requirement of a "well grounded belief" imposes the burden of a stricter or greater degree of proof than the law exacts and in that respect was erroneous, but the Court held that inasmuch as the complained of instruction was offered by the defendant he couldn't complain. We have examined the abstract and record in the instant case and are unable to determine who offered the self-defense instructions, nor do we detect any objection in the record by defendant to the

self-defense instructions given by the court. From our examination of the three instructions, in view of the evidence, we are satisfied that taken as a group they properly state the law of self-defense.

It is further contended that the prosecutor was guilty of misstating the evidence and further inflamed the passion of the jury by brandishing the weapon in front of the jury. It appears that the prosecutor, in closing argument, misstated that the defendant surrendered himself only after Jenkins and Sanders had been captured. The record disclosed that only Jenkins had been arrested at the time. When an objection was made, the prosecutor began to say, "If I have misstated it" when the court promptly commented that "the jury recalls the evidence." The jury heard the evidence and this misstatement, in our opinion, was harmless and did not mislead them. The prosecutor in brandishing the weapon before the jury argued "or does it sound that it is the desperate plea of the man who doesn't want to pay for his crime . . . a man who wants to hoodwink a jury and walk out of here free to take his gun back with him and to shoot someone else." Defense counsel objected saying, "Oh, I am going to object to this your honor. This is highly inflammatory." The court said, "Well the gun will be confiscated. Nobody will get a hold of the gun." The defendant argues that in addition to this inflammatory argument the error was compounded by the court's remarks which he states inferred to the jury that he believed that the defendant was guilty. We do not agree. If anything, the court was correctly dismissing from the minds of the jury the possibility that any one would get the gun back so that the remark of the prosecutor would not affect the jury. In People v. Burnett, 27 Ill2d 510, 517, 190 NE2d 338, the prosecutor stated that the deceased had a right to her life and, "She lies cold in her grave. All she can do, we must do for her." Also, "Of course counsel in an attempt to throw up a smoke screen

to fool the jury . . ." The Court while criticizing and not condoning these and other remarks by the prosecutor concluded, in Burnett, as we do here, that the entire magnitude of the prosecutor's argument, after reviewing the entire record, did not justify a reversal even though the jury in the instant case fixed the defendant's sentence which as defense counsel points out was not the situation in Burnett.

We therefore conclude that the defendant was proven guilty of the crime of murder beyond a reasonable doubt, that he was given a fair trial, and that no prejudicial error occurred.

The judgment of the Criminal Division of the Circuit Court is therefore affirmed.

Judgment affirmed.

MURPHY, P. J. and ADESKO, J., concur.